**C. LINE, INC., Plaintiff,**

v.

**CITY OF DAVENPORT; Craig Malin; and Alan Guard, Defendants.**

No. 3:11–cv–92.

United States District Court, S.D. Iowa, Davenport Division.

Aug. 2, 2013.

Michael J. McCarthy, McCarthy Lammers & Hines, Brubaker Flynn & Darland, Davenport, IA, Michael J. Meloy, Koos & Meloy Law Firm, Bettendorf, IA, for Plaintiff.

Samuel J. Skorepa, Rand S. Wonio, Lane & Waterman LLP, Davenport, IA, for Defendants.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court are the following motions: 1) a partial[1] Motion for Summary Judgment (Clerk's No. 35), filed by C. Line, Inc. ("Plaintiff" or "C. Line"); and 2) a Motion for Summary Judgment (Clerk's No. 47) filed by the City of Davenport ("Davenport"), Craig Malin ("Malin"), and Alan Guard ("Guard") (collectively "Defendants"). Defendants filed a resistance (Clerk's No. 46) to Plaintiff's Motion (Clerk's No. 46). Plaintiff field a resistance (Clerk's No. 51) to Defendants' Motion, and Defendants filed a Reply (Clerk's No. 53). The matters are fully submitted.

## I. FACTUAL BACKGROUND

C. Line is an Iowa limited liability company with its principal place of business in Davenport, Iowa. Pl.'s Statement of Material Facts ("Pl.'s Facts") ¶ 1 (Clerk's No.

---

1. Although not explicitly designated as partial, C. Line's addresses only Count III (procedural due process) of the Complaint in its Motion for Summary Judgment. *See* Pl.'s Mot. for Summ. J. at 1, 6–7 (Clerk's No. 35) (contending that Defendants are "liable to C. Line under 42 U.S.C. § 1983 due to Defendants' violations of C. Line's right to procedural due process of law," and requesting that the Court "enter a Summary Judgment in [C. Line's] favor finding Defendants … liable to C. Line … for their malicious, oppressive and reckless disregard of C. Line's C. Line's right to *procedural due process* of the law" (emphasis in original)); *see generally* Pl.'s Br. in Supp. of Mot. for Summ. J. (Clerk's No. 34.1).

The Court notes that C. Line does make an additional argument that it should, as a matter of law, be granted attorney fees as the prevailing party in the state court litigation. *See* Pl.'s Br. in Supp. of Mot. for Summ. J. at 22–24 (Clerk's No. 34.1). Title 42, United States Code, § 1988 authorizes courts to award reasonable attorneys' fees to prevailing parties in civil rights litigation. *See Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Given that the state court did not rule on C. Line's civil rights claim under § 1983, however, C. Line's motion in this regard is premature.

35.1). Davenport is a municipal corporation organized and existing under the Constitution and laws of the State of Iowa. *Id.* ¶ 2. At the times relevant to this case, Malin was Davenport's city administrator, and Guard was Davenport's finance director. *Id.* ¶¶ 3–4; Defs.' Resp. to Pl.'s Facts ("Defs.' Resp. to Pl.'s Facts") ¶ 4 (Clerk's No. 46.2). The parties agree that all of Defendants' actions in relation to this case were taken in the course and scope of official duties and under color of state law and authority. Pl.'s Facts ¶ 5.

In February 1997, C. Line opened an adult cabaret business called "Chorus Line" at 4128 North Brady Street in Davenport.[2] *Id.* ¶ 10. In 2001, Davenport adopted ordinance No. 2001–228, which established Chapter 5.16 of the Davenport Municipal Code to provide for the licensing and regulation of "adult entertainment" businesses. *Id.* ¶ 11. On August 19, 2003, C. Line was informed by a letter that Chorus Line must cease operating as an adult business. *Id.* ¶ 12. On October 14, 2003, C. Line filed suit against Davenport in this Court. *Id.* ¶ 13 (citing *C. Line, Inc. d/b/a Chorus Line v. City of Davenport, Iowa,* Case No. 3:03–cv–90113). On August 20, 2004, C. Line and Davenport entered into a Consent Decree. *Id.* ¶ 14. The Consent Decree was signed on behalf of Davenport by Assistant City Attorney Brian Heyer ("Heyer"), approved by the Court, and is fully binding on Davenport and its officers and employees. *Id.* ¶¶ 14, 18. Amongst other things, the Consent Decree provides:

1. The City of Davenport will issue an adult cabaret license to C. Line, Inc., d/b/a Chorus Line; § 5.16.120 notwithstanding. Said license shall be subject to the regulations of Chapter 5.16 and shall be renewable as provided thereunder.

2. C. Line, Inc. shall be allowed to amend its corporate structure, if necessary, such that the majority interest in C. Line, Inc., the owner of the adult cabaret license, may be sold or transferred to any otherwise qualified person or entity pursuant to Chapter 5.16 of the Davenport Municipal Code.

3. The Chorus Line is a pre-existing non-conforming use. . . .

[5]. The provisions of Chapter 5.16 may be enforced by the City of Davenport, except as modified by this Consent Decree. . . .

*Id.* ¶¶ 14–17.

At the time of the Consent Decree, C. Line was owned by Michael Cline ("Cline"). *Id.* ¶ 25. Cline sold C. Line to Larry Starkman, Michael Siegel, and Steven Brown in 2007. *Id.* In November 2008, C. Line voluntarily closed Chorus Line. *Id.* In December 2008, Chorus Line was evicted from 4128 Brady Street by a forcible entry and detainer petition granted in favor of the landlord of the property. *Id.* In early 2009, the corporate ownership of C. Line was transferred to Nadeem Mazhar ("Mazhar"). *Id.* ¶ 26.

On July 28, 2009, C. Line applied to Davenport for an adult entertainment license as part of the reopening of the Chorus Line adult cabaret business at 4128 Brady Street. *Id.* ¶ 30. Pursuant to Davenport Municipal Code § 5.16.050(A), three "reviewing departments" must approve adult entertainment licenses: the Fire Department, the Zoning and Land Use Department, and the Police Department. *Id.* ¶ 32. Each of the three reviewing departments recommended approving C. Line's application, and the matter was returned to Davenport's Finance Department for issuance of an adult entertainment business license under Davenport

---

**2.** The Chorus Line presents constitutionally protected expressive dance performances.

Pl.'s Facts ¶ 9. It originally opened at the Brady Street location in October 1991. *Id.*

Municipal Code §§ 5.16.040 and 5.16.050. *Id.* ¶¶ 31, 33–34.

On September 21, 2009, while C. Line's application was pending before the Finance Department, Malin performed a site inspection at Dr. John's Lingerie Boutique ("Dr. John's"), also located at 4128 North Brady Street. *Id.* ¶ 36. Dr. John's sells lingerie, shoes, hosiery, and adult novelties, movies, and magazines. *Id.* Since opening, it had operated under a general retail business license issued by Davenport in August 2008. *Id.* ¶¶ 36, 42. Indeed, Dr. John's had never been notified by Defendant that is was considered an "adult entertainment business" as defined by Chapter 5.16 of the Davenport Municipal Code.[3] *Id.* ¶ 44. After observing Dr. John's advertising and merchandise, Malin returned to City Hall and met with Matt Flynn ("Flynn"), the senior manager of the Community Planning and Economic Development Department, and Tom Warner ("Warner"), corporate counsel. *Id.* Under Warner's guidance, a letter was drafted denying C. Line an adult cabaret license pursuant to Davenport Municipal Code § 17.47.030(B), which prohibits two adult entertainment businesses from being located on the same lot or within 500 feet of each other. *Id.* According to the letter, Dr. John's was an adult business establishment situated in the same building and on the same lot as C. Line. *Id.* ¶ 41. Guard signed the letter and mailed it to Mazhar by certified mail on September 24, 2009. *Id.* ¶¶ 36, 39, 40.

On October 9, 2009, C. Line appealed Guard's denial of an adult entertainment license pursuant to Davenport Municipal Code § 5.16.050(F), which permits license denials to be appealed to the city administrator or his designee. *Id.* ¶ 46; Defs.' Statement of Add'l Material Facts ("Defs.' Facts") ¶ 1 (Clerk's No. 47.2). A hearing was held on the appeal on October 22–23, 2009, with Malin presiding.[4] Pl.'s Facts ¶ 49. During the hearing, Davenport presented only the testimony of Warner, who stated that he inspected Dr. John's on October 20, 2009, and based on his observations, believed that it was an "adult store."[5] *Id.* ¶ 52. Based on the assertion that Dr. John's was an adult store, Defendants maintained throughout the hearing that the nonconforming use established by the Consent Decree ran with the parcel of land and that it "leapfrogged" to Dr. John's when Chorus Line was evicted from the Brady Street location.[6] Defs.' Facts

---

3. Defendants admit that Dr. John's was never notified that it was considered an "adult entertainment business establishment" until Heyer sent Dr. John's a letter on May 18, 2010. Pl.'s Facts ¶ 45.

4. C. Line objected to Malin acting as the hearing officer in writing before the hearing and renewed its objection twice during the course of the October 22–23, 2009 hearing. Pl.'s Facts ¶ 48. Malin overruled C. Line's objections and declined to recuse or disqualify himself. *Id.*

5. Defendants admit that Warner did not make any square footage measurements or count any of Dr. John's inventory, but contend that Warner did state he "was certain and it was very clear that more than ten percent of the merchandise was adult material." Defs.' Resp. to Pl.'s Facts ¶ 52.

6. Defendants' counsel argued at the October 22–23, 2009 hearing:

[A] nonconforming use has been established. Nonconforming use runs with the parcel, not with the business. It allows for one adult business to be located on that parcel. That adult business had been the Chorus Line. The Chorus Line left. In the meantime, there's another business that's in the same parcel, Doctor John's boutique, so Doctor John's is clearly. an adult business by all the evidence that was presented here. The minute the Chorus Line closed their doors, they took up that nonconforming use, and they now have it. That's why this new organization that wants to reopen the Chorus Line [ ] can't locate there.

Pl.'s App. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s App.") at 182 (Clerk's No. 35.2).

¶ 4. Warner admitted, however, that C. Line had an adult entertainment license under the terms of the 2004 Consent Decree and that a nonconforming use had to be out of business for more than one year to lose its rights to a nonconforming use under Davenport's zoning ordinances. Pl.'s Facts ¶¶ 53–54.

For its part, C. Line admitted the Consent Decree into evidence, argued that C. Line had a right to an adult entertainment license thereunder,[7] and called several witnesses.[8] *Id.* ¶¶ 50–51. Dr. John's store manager, Kelly Smith ("Smith"), opined that Dr. John's was not an "adult store," because it holds a retail business license, has never been advised that it needed an adult entertainment business license, and sells many items that could be found at similar retail stores like Victoria's Secret and Spencer Gifts.[9] *Id.* ¶ 56. Flynn testified that, on behalf of the land use department, he signed off on C. Line's license application after merely looking in the windows of Dr. John's. *Id.* ¶ 58. Guard testified that: 1) he signed the letter denying C. Line's license application without having the application in front of him (*id.* ¶ 61); 2) in the three years before the hearing, he had not renewed any of the three other adult entertainment business licenses issued by Davenport [10] (*id.* ¶ 60); 3) he never personally inspected Dr. John's before issuing the denial letter; rather, he relied solely on information given to him by Warner or by Malin after Malin's September 21, 2009 site inspection [11] (*id.* ¶¶ 59, 63); and 4) at the time he denied C. Line's application, he did not know whether or not the Chorus Line had been closed for more than twelve months. *Id.* ¶ 64.

On October 23, 2009, following the conclusion of the hearing, Malin performed a "follow up" site inspection to Dr. John's to ascertain for himself the approximate percentage of adult material for sale in the store.[12] *Id.* ¶ 66. On October 26, 2009,

---

7. In particular, C. Line's counsel argued that C. Line possessed a legal nonconforming use pursuant to the 2004 Consent Decree. Defs.' Facts ¶ 3.

8. In total, C. Line presented seven witnesses and sixteen exhibits. Defs.' Facts ¶ 2.

9. Dr. John's President, John Coil, also wrote a letter to C. Line's attorney stating that Dr. John's is not an adult business and has never paid for an adult entertainment license. Pl.'s Facts ¶ 57.

10. Randy Cuevas, a city public service representative, testified that, to his knowledge, no one in the Davenport finance department had handled any renewals of adult entertainment licenses in the last three years. Pl.'s Facts ¶ 62.

11. Defendants emphasize, however, that Guard did take steps to ensure the accuracy of the denial letter before he signed it to ensure he was following due process. Defs.' Resp. to Pl.'s Facts ¶¶ 59, 63 (stating Guard testified that he "performed an additional investigation to verify that the letter was accurate and that Dr. John's was, indeed, operating as an adult business within 500 feel of the Chorus Line").

12. C. Line emphasizes that Malin's post-hearing inspection "was done without the knowledge and consent of C. Line." Pl.'s Facts ¶ 67. Defendants deny that C. Line lacked knowledge of the visit, asserting that the "store manager was present and provided information to Mr. Malin." Defs.' Resp. to Pl.'s Facts ¶¶ 67, 69. The "store manager" Defendants refer to, however, is Smith. *See* Pl.'s App. at 66 (Malin stating in his decision on the appeal: "After the hearing, a follow up site inspection of Dr. John's was conducted to ascertain the approximate percentage of adult material for sale at the store. In my capacity as Hearing Officer, I conducted this inspection, and Store Manger Smith was present as I arrived at the store."). Smith, however, is an employee of Dr. John's, not of C. Line. Thus, her presence during Malin's site inspection does nothing to demonstrate that C. Line knew of or consented to the inspection.

Malin entered a decision denying C. Line's appeal and upholding Guard's September 24, 2009 denial of C. Line's application for a new adult entertainment business license. *Id.* ¶ 68. Malin based his decision predominantly on his own inspection of Dr. John's. *Id.* ¶¶ 69–70; *see* Pl.'s App. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s App.") at 66 (Clerk's No. 35.2) (Malin explaining his observations from the October 23, 2009 visit and concluding that "[i]t is the undersigned's opinion, confirmed by direct inspection and calculation at the post hearing site inspection, that Dr. John's is, by its inventory, advertisement and admission of its own employees, an adult establishment"). Although Malin acknowledged the Consent Decree in his ruling, he did not address Defendants' arguments about it, concluding instead that Dr. John's status as an adult establishment was dispositive. Pl.'s Facts ¶ 71; Defs.' Resp. to Pl.'s Facts ¶ 71.

On October 26, 2009, C. Line filed an appeal from Malin's decision with the Zoning Board of Adjustment ("ZBA") and paid a $250 filing fee. Pl.'s Facts ¶ 75. Although Scott Koops ("Koops") of the Davenport Community Planning and Economic Development Department initially accepted the appeal and fee, he sent an email to C. Line the following day stating that Dav-

enport refused to permit C. Line to appeal Malin's decision to the ZBA.[13] *Id.* ¶¶ 75–76. On October 29, 2009, Koops returned C. Line's appeal application and filing fee. *Id.* ¶ 77. C. Line's attorney demanded that the appeal be placed on the ZBA's agenda for an upcoming November 4, 2009 meeting, but Koops denied the request. *Id.* ¶¶ 78–79. C. Line's attorney appeared at the November 4 agenda meeting and again requested, without success, that the appeal be placed on the agenda. *Id.* ¶ 80.

On November 13, 2009, C. Line filed a petition in the Iowa District Court for Scott County against Defendants Davenport and Malin requesting a writ of certiorari, declaratory judgment, a writ of mandamus, and a writ of injunction.[14] *Id.* ¶ 82. On June 10, 2010, Iowa District Court Judge James E. Kelley issued a ruling on C. Line's request for summary judgment in the case. *See* Pl.'s App. at 90–104. In particular, Judge Kelley granted Plaintiff's request for a writ of certiorari, finding that "the Decision of Craig Malin in this case is illegal and the Plaintiff is entitled to a hearing by a disinterested, impartial hearing officer to be appointed by the court." [15] *Id.* at 98. Judge Kelley did not address C. Line's mandamus and injunction claims, but did conclude that his decision to grant

---

**13.** Defendants contend that an appeal to the ZBA was not appropriate because Malin was not acting as the Director of Economic Development in issuing his decision on C. Line's appeal. Defs.' Resp. to Pl.'s Facts ¶¶ 74, 76–80.

**14.** On December 2, 2009, C. Line also filed a petition for a writ of certiorari against the ZBA in Iowa District Court case number LACV114780. *Id.* ¶ 81. This action was dismissed without prejudice by C. Line on July 23, 2012. *Id.*

**15.** In reaching his conclusion, Judge Kelley stated:
> In this case, the record is quite clear form both the transcript and the written decision that Defendant Craig Malin assumed a per-

sonal commitment to a particular result in the case, that is, the denial of the license. The investigating done by Craig Malin both before the hearing and after the hearing, and the questioning of at least one witness after the Assistant City Attorney had concluded cross examination of that witness, indicate a personal bias toward an outcome desired by Defendant Malin. This combination of all three functions of investigation, advocacy and adjudication, has the appearance of fundamental unfairness in this administrative hearing, thus vitiating its legal effect.

Pl.'s App. at 97–98.

the writ of certiorari made C. Line's request for declaratory judgment unripe for decision. *Id.* at 98.

C. Line moved to enlarge Judge Kelley's findings. *Id.* at 105. Because Judge Kelley had retired, the motion was referred to Judge Marlita Greve. *Id.* at 106. Following a hearing, Judge Greve ruled on September 22, 2010 that C. Line was entitled to a declaratory judgment that "C. Line has a valid and existing Adult Entertainment Business License, which does not need to be renewed under Chapter 5.16 of the City of Davenport Code" and that "C. Line can immediately open its cabaret business at 4128 Brady Street, Davenport, Iowa as a legal nonconforming use without the necessity of obtaining a renewed license from the City because of the federal consent decree in place." [16] *Id.* at 110. Judge Greve further found that, in light of this ruling, C. Line was entitled to a writ of mandamus "ordering that C. Line has a valid and existing Adult Entertainment Business License and that Defendants shall immediately allow C. Line to open its cabaret business at 4128 Brady Street, Davenport, Iowa as a legal nonconforming use." *Id.* at 110–11. Judge Greve additionally ruled that in light of the grant of declaratory judgment and mandamus, "the appointment of a special master under a

---

**16.** The following represents Judge Greve's discussion, in pertinent part, of the parties' arguments and the basis for the grant of declaratory judgment in favor of C. Line:

> C. Line's declaratory judgment petition asks the Court to find it has a valid and existing Adult Entertainment Business License, which does not need to be renewed under Chapter 5.16 of the City of Davenport Code, and further that C. Line can immediately open its cabaret business at 4128 Brady Street, Davenport, Iowa as a legal nonconforming use without the necessity of obtaining a renewed license from the City because of the federal consent decree in place.
>
> . . .
>
> The City argues C. Line lost its nonconforming use, which remains with the land. The City argues this nonconforming use "leap-frogged" to Dr. John's Lingerie Boutique upon Chorus Line's eviction.
>
> . . .
>
> The Court finds the nonconforming use here remained with the land. However, C. Line did not lose its right to that nonconforming use because it did not legally abandon it. Davenport City Code § 17.46.020 provides: In the event that a nonconforming use of any building or premises is discontinued or its normal operation stopped for a period of one year, the use of the same shall thereafter conform to the regulations of the district in which it is located. (Ord. 87–427 § 1: prior code § 42–108). C. Line did not stop operations for more than one year. Chorus Line ceased operating in November of 2008; however, Mr. Mazhar filed for an Adult Entertainment Business License in July of 2009, which was approved by three City departments by early September of 2009. C. Line was not a party to the eviction of the Chorus Line and did not legally abandon its right to the nonconforming use of 4128 North Brady Street. Further, the City's Code provides a one-year grace period where operations may cease before a property loses its nonconforming use status. *See* Davenport City Code § 17.46.020. Therefore, C. Line had the right to the nonconforming use of 4128 North Brady Street for the one-year period following the eviction of Chorus Line and other entities
>
> Here, the City admitted and the Court also finds under the federal consent decree, C. Line presently holds a valid Adult Business Entertainment License in the City of Davenport and has held such license since the 2004 consent decree. Further, Dr. John's is not licensed as an adult business entertainment operation, nor has it been required to do so by the City. Thus, there is just one Adult Business Entertainment License at this address. The City's argument that somehow this license and nonconforming use became Dr. John's upon the eviction of the Chorus Line makes no sense on these facts especially considering its own Code § 17.46.020 in effect at the time which granted C. Line a one-year grace period for maintaining the right to a nonconforming use at 4128 Brady Street, Davenport, Iowa.

Pl.'s App. at 107–09.

writ of certiorari to hear the appeal [is now] moot." *Id.* at 102. On December 7, 2010, Judge Greve further ruled that she "cannot make a finding establishing Defendants' liability regarding due process violations or that Defendants' conduct was unreasonable, arbitrary and capricious based on the summary judgment record only." [17] *See* Pl.'s App. in Resistance to Defs.' Mot. for Summ. J. (Clerk's No. 50–3) at 2.

Defendants appealed Judge Kelley's June 10, 2010 decision and Judge Greve's September 22, 2010 decision. *See* Pl.'s Facts ¶ 86; Pl.'s App. at 116–29. C. Line filed a cross-appeal on Judge Greve's December 7, 2010 Order denying summary judgment. Defs.' Facts ¶ 11; Pl.'s App. at 122. The appeals were adjudicated by the Iowa Court of Appeals on December 7, 2011. *See* Pl.'s Facts ¶ 86; Pl.'s App. at 116–129. The Court of Appeals affirmed Judge Greve's grant of declaratory relief in favor of C. Line and agreed that Judge Kelley's writ of certiorari was rendered moot by the grant of declaratory relief. Pl.'s App. at 121–22. Regarding C. Line's claim that it was entitled to summary judgment on its due process claims, the Court of Appeals held: "One of the by-products of [C. Line's] procedural move [of seeking a declaratory judgment which had the effect of mooting the writ of certiorari] is that there are no findings on the remand which might demonstrate the violations alleged by C. Line." *Id.* at 122. Thus, the Court of Appeals affirmed the trial court's denial of C. Line's request for summary judgment, finding that it "correctly ruled that summary judgment on the due process claim for damages and attorney fees could not be granted based on the record at that time." *Id.* at 122–23. The matter was remanded to the district court for further proceedings. *Id.* at 123.

Defendants sought further review from the Court of Appeals, but its request was denied. Defs.' Facts ¶ 13. C. Line did not request further review of the Court of Appeals decision. *Id.* Rather, C. Line dismissed its state court action on July 23, 2012, opting instead to proceed solely in the present federal action, wherein Plaintiff has asserted claims against Defendants for: 1) enforcement of the August 20, 2004 Consent Decree; 2) takings pursuant to the Fifth and Fourteenth Amendments; 3) procedural due process violations; and 4) substantive due process violations.[18] *See* Compl. (Clerk's No. 1).

## II. SUMMARY JUDGMENT STANDARD

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[19] *Id.* at 273,

---

17. Notably, Judge Greve did not reference Plaintiff's procedural due process claim; rather she discussed Plaintiff's request that "the court ... make a finding Defendants violated its substantive due process rights. Plaintiff argues the court should make a finding based on the existing record that Defendants' actions were unreasonable, arbitrary and capricious and that Defendants' actions had no demonstrable rational relationship to the welfare of the community." Pl.'s App. in *Resistance to Defs.' Mot. for Summ. J.* (Clerk's No. 50–3) at 2.

18. Plaintiff filed its Complaint in this action on July 27, 2011, before the Iowa Court of Appeals issued its decision. *See* Clerk's No. 1. On September 14, 2011, the Court stayed the action after the parties jointly requested a stay pending resolution of their appeals before the Iowa Court of Appeals. Clerk's Nos. 8–9.

19. Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay." [20] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64

S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not de-

---

**20.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct.

724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

signed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Particularly in the presence of competing cross motions for summary judgment, a court must keep in mind that summary judgment is not a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920

(7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed.1998)).

 Neither does filing cross motions for summary judgment mean the parties have waived their right to trial. *See Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir.1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits.") (citations omitted). Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of their own motion. *See Federal Practice and Procedure* § 2720; *see also Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir.2002) (reviewing the record with "all inferences in favor of the party against whom the motion under consideration is made") (citing *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.1998)). "Cross motions simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank*, 370 F.3d 164, 170 (1st Cir.2004) (quoting *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir.1996)). In this matter, then, each motion will be "evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law." *St. Luke's*

*Methodist Hosp. v. Thompson,* 182 F.Supp.2d 765, 769 (N.D.Iowa 2001). Nevertheless, the Court is mindful that "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson,* 149 F.3d 821, 824 (8th Cir.1998).

### III. LAW AND ANALYSIS

#### A. *Defendants' Motion for Summary Judgment: Count One*

In Count One of the Complaint, C. Line asserts that the Court should "enter an order declaring the rights of the parties under [the 2004] Consent Decree" and "enter judgments granting injunctive relief and monetary damages as necessary to grant C. Line the relief to which it is entitled." Compl. ¶ 66. C. Line further contends that Defendants "have acted willfully, wantonly, and for oppressive reasons an in an obstinate manner in disobeying the Consent Decree." *Id.* ¶ 68. Thus, according to C. Line, it is "entitled to a finding that Defendants are in civil contempt of court for failure to abide by this Court's order and an order and judgment awarding C. Line monetary penalties for contempt and damages for its losses caused by Defendants' violations of said Consent Decree." *Id.* ¶ 69.

Defendants assert that C. Line's request for an order declaring the parties' rights is moot because the Iowa Court of appeals has already declared that the Consent Decree permits C. Line to operate the Chorus Line at the Brady Street location as a nonconforming use. *See* Defs.' Mot. for Summ. J. ("Defs.' Mot.") at 1 (Clerk's No. 47). Defendants further contend that they are entitled to summary judgment on C. Line's request for a contempt finding because "there is no genuine issue of material fact to show that [Defendants] were in contempt of court." *Id.* C. Line counters that "Count I is not moot" because "Defendants have not issued C. Line an adult cabaret license," and that "Defendants are in contempt of the 2004 Federal Consent Decree." Pl.'s Response and Resistance to Defs.' Mot. for Summ. J. ("Pl.'s Resistance") at 1 (Clerk's No. 50).

1. *Is C. Line's request for enforcement of the Consent Decree moot?*

The 2004 Consent Decree provided: "The City of Davenport *will issue an adult cabaret business license to C. Line, Inc.,* d/b/a Chorus Line: § 5.16.120 notwithstanding. Said license shall be subject to the regulations of Chapter 5.16 and shall be renewable as provided thereunder." Pl.'s Facts ¶ 15 (emphasis added). As well, the Iowa Court of Appeals stated in its December 7, 2011 decision: "C. Line has a valid and existing adult entertainment license and the status of a nonconforming use. The City of Davenport *shall issue C. Line an adult entertainment license,* and permit it to open immediately." Pl.'s App. at 122 (emphasis added).

Defendants argue that since the Iowa Court of Appeals granted C. Line "complete relief on its enforcement claim ... the federal enforcement action is moot." Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.") at 8 (Clerk's No. 47.1). Although C. Line admits that the Chorus Line "cabaret is now operating without a license per court order," it nonetheless contends that its claim for enforcement is not moot because the Defendants have never issued it a physical adult business entertainment license and, thus, are in direct violation of both the Consent Decree and the Iowa Court of Appeals decision. Pl.'s Br. in Resistance to Defs.' Mot. ("Pl.'s Resistance Br.") at 2–3 (Clerk's No. 50.2).

Both parties cite *Kennedy Building Associates v. Viacom, Inc.,* in support of their position. *See* 375 F.3d 731 (8th Cir.2004). As to mootness, the *Kennedy* court explained:

"Simply stated a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). The "heavy" burden of proving mootness falls on the party asserting the case has become moot. *Id.* A case becomes moot if it can be said with assurance that there is no reasonable expectation that the violation will recur or if interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *Id.*

. . .

Relief granted in another tribunal can moot a claim, but only where the relief granted is complete. *See Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 35 n. 5, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980); 13A Charles Alan Wright et al., *Federal Practice and Procedure* § 3533.2 & n. 31 (1984 & 2003 Supp.) ("Partial relief in another action, on the other hand, does not moot an action seeking additional relief.").

*Id.* at 745.

 Even assuming C. Line is correct that it was not afforded "complete" relief

by the Iowa Court of Appeals decision due to Defendants' continued refusal to issue a paper adult entertainment license, the Court nonetheless finds C. Line's enforcement request moot. As C. Line acknowledges,[21] the Iowa Supreme Court held on July 27, 2012, that all municipal ordinances regulating live nude dancing are null and void because they are expressly preempted by Iowa Code § 728.11.[22] *See Mall Real Estate L.L.C. v. City of Hamburg,* 818 N.W.2d 190, 195–97 (Iowa 2012) (holding that Iowa Code Chapter 728 applies to live nude dancing and that "§ 728.11 "restrict[s] governmental subdivisions from enacting any local ordinance regulating conduct covered in . . . chapter 728," and noting that the "plain language of section 728.11 also creates an exception for a local government's *zoning* authority, not for its licensing or permitting authority" (emphasis added)). Thus, the question of whether Defendants must issue C. Line a paper adult entertainment business license is no longer "live" because the very ordinance under which such a license would issue has been rendered void—at least as to its licensing restrictions—by *Mall Real Estate.*[23] Likewise, C. Line lacks a "legally cognizable interest" in obtaining a paper adult entertainment business license for the very same reason.

**21.** *See* Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Br.") at 7 n. 2 (Clerk's No. 34.1).

**22.** Iowa Code § 728.11 provides:

In order to provide for the uniform application of the provisions of this chapter relating to obscene material applicable to minors within this state, it is intended that the sole and only regulation of obscene material shall be under the provisions of this chapter, and no municipality, county or other governmental unit within this state shall make any law, ordinance or regulation relating to the availability of obscene materials. All such laws, ordinances or regula-

tions shall be or become void, unenforceable and of no effect on January 1, 1978. Nothing in this section shall restrict the zoning authority of cities and counties.

**23.** The Court is somewhat perplexed by C. Line's insistence that it is entitled to a license under a statutory scheme that C. Line itself admits is void. *See* Pl.'s Br. 7 n. 2 ("The City of Davenport attempts to regulate live nude dancing by requiring the owners of cabaret businesses to obtain licenses from the City of Davenport to operate their cabaret businesses offering live nude dancing under Davenport City Code chapter 5.16. Under the *Mall Real Estate* case, Davenport City Code chapter 5.16 is null and void.").

*2. Are Defendants' entitled to summary judgment on C. Line's request for an order finding them in civil contempt?*

Title 18, United States Code, § 401 grants the Court statutory authority to impose civil sanctions. As well, the Court is vested with "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *see also Mahers v. Hedgepeth,* 32 F.3d 1273, 1275 (8th Cir.1994) ("District courts have many remedial powers to ensure that their decrees are fully and faithfully obeyed."). To sustain a finding of civil contempt, C. Line has the burden of demonstrating by clear and convincing evidence that an Order of the Court was in effect, that Defendants knew of the Order, and that Defendants failed to comply with the Order.[24] *See Hazen v. Reagen,* 16 F.3d 921, 924–25 (8th Cir.1994). C. Line is not, however, required to show that any claimed violation of a court order was intentional or willful. *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949) ("The absence of willfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act."). The Eighth Circuit has recognized that "[t]he contempt power is a most potent weapon, and therefore it must be carefully and precisely employed." *Mahers,* 32 F.3d at 1275.

Defendants first claim that summary judgment in favor of Guard is proper because "Guard did not have knowledge of the [Consent Decree]." Defs.' Br. at 7; *see* Defs.' App. in Supp. of Defs.' Mot. for Summ. J. (Clerk's No. 47.3) at 5 (Guard Dep.: Q: "And it would be a fair statement to say back in 2009 when you issued your September 24th denial letter, you had no knowledge or understanding of this Consent Decree, right?" A. "Yes."). C. Line does not dispute Guard's claimed lack of knowledge; rather, C. Line claims that Guard "had a responsibility as finance director to know about the decree" and that Guard "should have known about the decree because of his duties in issuing all cabaret licenses." Pl.'s Resistance Br. at 4.

Although the Court agrees that Guard arguably should have known about the Consent Decree given the contours and responsibilities of his job with the City, Plaintiff does not cite a single authority where civil contempt sanctions were sustained on a theory that the alleged contemnor violated an order that he "should have known" about. Indeed, the Eighth Circuit Court of Appeals has expressly stated that, "[b]efore a party can be held in contempt for violating a court order, he must have *actual knowledge* of the order." *Hazen v. Reagen,* 16 F.3d 921, 924 (8th Cir.1994) (emphasis added). Ac-

---

**24.** Ordinarily, once a party seeking a civil contempt finding meets the burden to proffer clear and convincing evidence that the alleged contemnors violated a court order, the burden shifts to the alleged contemnor to show an inability to comply. *See Chicago Truck Drivers,* 207 F.3d at 506 (holding that a contempt finding may be averted if the alleged contemnor establishes: 1) that they were unable to comply with the court order, explaining why "categorically and in detail"; 2) that the inability to comply was not self-induced; and 3) that they made "in good faith all reasonable efforts to comply." *Id.* (quotation marks and citations omitted)). In the present case, however, Defendants "do not claim ... that it was impossible for the City to comply with the Consent Decree." Defs.' Br. in Reply to Pl.'s Resistance to Defs.' Mot. for Summ. J. ("Defs.' Reply Br.") at 2 (Clerk's No. 53).

cordingly, summary judgment in favor of Guard is appropriate on the contempt count.[25]

Defendants next argue that summary judgment should be granted in their favor on C. Line's contempt claim because "[a]lthough Malin had knowledge of the federal consent decree ... this does not mean that his decision was disobedience to the consent decree." Defs.' Br. at 7. Specifically, Defendants point out that Malin "sought advice about whether C. Line continued to have a legal nonconforming use and was advised by both City Attorney Warner and Assistant City Attorney Heyer that the nonconforming use ran with the land and became Dr. John's when Plaintiff was evicted from the property.... Just because the City's legal position was not sustained by the Iowa courts, does not mean that Defendants were disobeying the consent decree." *Id.* at 7–8. Further, Defendants claim that even if Malin's decisions are considered noncompliance with the Consent Decree, "he should not be held in contempt because his action and the actions of the City were based on a good faith and reasonable interpretation of the consent judgment." *Id.* at 7.

In support of their "good faith/advice of counsel" argument, Defendants present detailed affidavits by both Malin and Hey-

er. *See* Defs.' App. at 33–41 (Heyer Aff.); *id.* at 42–45 (Malin Aff.). In his affidavit, Heyer outlines his involvement in the case, explains how he reached his legal opinion that the nonconforming use in the Consent Decree had been extinguished and/or transferred to Dr. John's, and recounts that he shared his legal opinion on numerous occasions with Malin and other elected officials of the City. *See id.* at 33–41. For his part, Malin recounts his role in the case, explains why he declined to recuse himself from the October 22–23, 2009 hearing, and discusses how he reached the decision to deny C. Line's appeal following hearing, including that he "sought advice from the City Attorney about whether C. Line continued to have a legal nonconforming use and I was advised by both City Attorney Warner and Assistant City Attorney Heyer that the nonconforming use 'ran with the land' and became Dr. John's when Plaintiff was evicted from the property." *Id.* at 42–45. C. Line vehemently objects to Defendants' reliance on Heyer's and Malin's affidavits. *See* Pl.'s Resistance Br. at 5–11. In particular, C. Line contends that "Defendants" 'legal opinion' argument is a bold attempt [by Defendants] to mask their illegal acts and to legitimize their violations of the 2004 Federal Consent Decree, pointing out that:

---

**25.** The Court has found some authority outside the Eighth Circuit holding that "for purposes of a civil contempt action, actual knowledge of a court order will be imputed to a party when that party had the opportunity to know of a court order, but simply chose not to gain actual knowledge of the order." *In re Araujo,* 292 B.R. 19, 24 (D.Conn.2003) (quotation and citations omitted); *see also In re Walter,* 265 B.R. 753, 760 (N.D.Ohio 2001) ("For purposes of the first prong of the civil contempt test, actual knowledge of a court order is not an absolute prerequisite to hold a party liable for civil contempt. Instead, for purposes of a civil contempt action, actual knowledge of a court order will be imputed to a party when that party had the opportunity

to know of a court order, but simply chose not to gain actual knowledge of the order."). The reason for such a rule was aptly described in *In re Walter:* "Such a principle is absolutely necessary as our entire judicial system would become unworkable if any person wishing to ignore an order of a court could simply claim that, although they had the opportunity to see the order, they chose not to." 265 B.R. at 760. Even, however, were the Court to adopt an "imputed knowledge" principle in this case, summary judgment in favor of Guard would still be proper because the record is devoid of any assertion that Guard even had access to the Consent Decree, let alone that he was aware of it but elected not to review it.

1) Defendants have never previously asserted that Heyer gave a legal opinion to Malin that Malin claims to have relied on; 2) Defendants have never pled Heyer's legal opinion as a defense; 3) Defendants have not offered sufficient facts about Heyer's opinion to permit it to be evaluated[26]; 4) Heyer's legal opinions are not supported by the sources he cites or by Iowa law in general; and 5) Heyer's claims about adult material in Dr. John's have no factual support in the record. *Id.*

■ Although Defendants urge that C. Line has failed to show "clear and convincing evidence to establish that Defendants are in contempt of court," *id.* at 8, C. Line is not required to sustain its ultimate burden of proof on the contempt claim at this stage of the proceedings. Rather, since only *Defendants* are seeking summary judgment on C. Line's contempt claim,[27] it is incumbent upon them to demonstrate the absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56(a). Defendants concede, however, that C. Line can prove the first two elements of its contempt claim—that there was a valid Court Order in effect and that Malin, acting in his official capacity as an agent of the City, knew of the Order. As to the third element, whether Defendants violated the Consent Decree, C. Line has, at a minimum, raised a genuine issue of material fact sufficient to defeat Defendants' request for summary judgment. "One of the overarching goals of a court's contempt power is to ensure that litigants do not anoint themselves with the power to adjudge the validity of orders to which they are subject." *Chicago Truck Drivers v. B'hd Labor Leasing,* 207 F.3d 500, 504 (8th

Cir.2000). Given that the Iowa Court of Appeals expressly rejected both Defendants' argument that C. Line abandoned its prior nonconforming use and its argument that C. Line's prior nonconforming use "leapfrogged" to Dr. John's, it is somewhat disingenuous for Defendants to now claim there is no genuine issue of material fact as to whether they "violated" the Consent Decree. *See* Pl.'s App. at 122 (Iowa Court of Appeals holding that "C. Line has a valid and existing adult entertainment license and the status of a nonconforming use. The City of Davenport shall ... permit it to open immediately.").

To the extent they claim that their actions were based on a good faith and reasonable interpretation of the Consent Decree, Defendants are essentially asking the Court to exercise its discretion *not* to hold them in contempt. *See F.T.C. v. Neiswonger,* 580 F.3d 769, 773–74 (8th Cir.2009) ("We review a district court's imposition of a civil contempt order and assessment of monetary sanctions for abuse of discretion." (quotations and citations omitted)). Defendants cite two federal district court cases in support of their argument. Defs.' Br. at 7. In the first, *Rinehart v. Brewer,* the court declined to make a contempt finding because "specific portions of the [order allegedly violated] were sufficiently general to permit defendant to interpret them as he did." 483 F.Supp. 165, 170–71 (S.D.Iowa 1980). Recognizing that a person may be held in contempt of court "only if [the order allegedly violated] is sufficiently specific and clear so that there is no doubt about what it mandates," the court concluded that the defendant's actions would not be deemed contemptuous

---

**26.** In particular, C. Line claims that Defendants have not identified the date Heyer gave his opinion, the actual content of the opinion, to whom it was given, the reason it was given, or who requested the opinion in the first instance. Pl.'s Resistance Br. at 7.

**27.** C. Line has not moved for summary judgment in its own favor on the contempt claim. *See generally* Pl.'s Mot. for Summ. J. (Clerk's No. 35) (seeking summary judgment only on C. Line's procedural due process claim).

because they were "based on good faith and reasonable interpretation" of the order at issue. *Id.* In the second case, *Chase Industries, Inc., Durus Division v. Frommelt Industries, Inc.*, the court recognized that "[i]f a defendant's actions are based on a good faith and reasonable interpretation of the [order allegedly violated], he should not be held in contempt." 806 F.Supp. 1381, 1386 (N.D.Iowa 1992); *see also Carey Licensing, Inc. v. Erlich*, 627 F.Supp.2d 1029, 1036 (E.D.Mo.2007).

■ The Court does not read either *Rinehart* or *Chase Industries* as establishing any sort of good faith defense to civil contempt. Rather, these decisions merely reflect the well-established principle, recognized in *Rinehart*, that "[a] contempt order must be based on a party's failure to comply with a 'clear and specific' underlying order." *Chaganti & Associates, P.C. v. Nowotny*, 470 F.3d 1215, 1223 (8th Cir. 2006) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 293 F.3d 409, 418 (8th Cir.2002)). Indeed, a civil contempt finding would likely be deemed both arbitrary and capricious if imposed on the basis that an individual violated an order that was unclear or insufficiently specific to guide that person's conduct. For this reason, most courts hold that good faith, advice of counsel, and other arguments that attempt to explain *why* a person violated a court order "may be considered in mitigation of the sanction but [do] not constitute a defense to contempt of court." *Securities and Exchange Commission v. First Fin. Grp. of Tx.*, 659 F.2d 660, 670 (5th Cir.1981); *see also United States v. Remini*, 967 F.2d 754, 757–58 (2d Cir.1992) ("[A]dvice of counsel

is not a defense to the act of contempt, although it may be considered in mitigation of punishment." (quoting *United States v. Goldfarb*, 167 F.2d 735, 735 (2d Cir.1948) (per curiam))); *TWM Mfg. Co., Inc. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir.1983) ("[A]dvice of counsel and good faith do not relieve from liability for a civil contempt, although they may affect the extent of the penalty[.]"). The Court finds this totality-of-the-circumstances approach to determining contempt sanctions reasonable and appropriate.

■ In the present case, Defendants contend that Malin's and Heyer's affidavits demonstrate why it would be improper to impose contempt sanctions against them.[28] Mitigation, however, is precisely the type of factual issue that is inappropriate for resolution on summary judgment. *See, e.g., United States v. Goodman*, 509 F.3d 872, 875 (8th Cir.2007) (finding in the criminal context that "a mitigating role reduction is a question of fact"); *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1062 (8th Cir.2002) (reviewing trial court's findings on mitigation of damages as a factual issue subject to clear error review). Indeed, to grant summary judgment in favor of Defendants on the basis of the record now before it, the Court would, at the very least, need to find Malin and Heyer credible and accept their inherently self-serving affidavits as true, without benefit of live testimony or cross-examination. A "judge's function [at the summary judgement stage, however,] is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Conolly v. Clark*, 457 F.3d 872, 876 (8th

**28.** As indicated, Defendants actually argue much more broadly that no contempt finding should be found against them due to good faith and advice of counsel. Because the Court has already determined that good faith and advice of counsel only mitigate any potential contempt sanction, however, the Court will focus only on whether Defendants can establish an entitlement to summary judgment on the basis that sanctions are improper under the facts of this case.

Cir.2006); *see also Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) ("Cases that turn crucially on the credibility of witnesses' testimony should not be resolved on summary judgment."). The Court additionally notes that, even if it found Malin and Heyer credible based on their affidavits alone, the fact that Heyer formulated a legal opinion about the validity of C. Line's nonconforming use/adult entertainment license does not necessarily lead to a conclusion *either* that the Consent Decree was insufficiently clear or specific *or* that Heyer's legal opinion was a reasonable one. Accordingly, Defendants' motion for summary judgment on Plaintiff's request for a civil contempt finding and sanctions is denied as to all Defendants except for Guard, for the reasons stated *supra*.

### B. *Defendants' Motion for Summary Judgment: Counts Two and Four*

In Count Two of the Complaint, C. Line asserts that, "Due to Defendants' actions in denying C. Line's right to operate its adult cabaret business under its existing cabaret license, C. Line was deprived of the use of its real property for a period of 363 days." Compl. ¶ 73. According to C. Line, "Defendants' actions were in violation of C. Line's property rights to use the [Brady Street] [p]remises to operate its cabaret business and were a taking of C. Line's property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution." *Id.* In Count Four of the Complaint, C. Line asserts that Defendants violated its substantive due process rights by taking various actions designed to prevent C. Line from opening its cabaret, thereby interfering with "C. Line's fundamental right to ownership and enjoyment of its property protected by the Fifth and Fourteenth Amendments to the Constitution." *Id.* ¶ 84.

Defendants request the Court grant summary judgment in their favor on C. Line's takings claim on the basis that "[n]o Taking of a protected right occurred as a matter of law." Defs.' Br. at 9. In particular, Defendants assert that because C. Line "could have used the premises for other purposes," the "denial of C. Line's adult cabaret license did not physically invade C. Line's property, take control of C. Line's premises, nor deprive C. Line of all economically beneficial use of the premises." *Id.* As to C. Line's substantive due process claim, Defendants claim an entitlement to summary judgment because "C. Line can present no evidence or insufficient evidence that the City's conduct was irrational or that one or more of C. Line's fundamental rights or constitutionally protected property interests were violated." *Id.* at 19. In response to Defendants' request for summary judgment, C. Line "stands on its arguments made in its Brief in Support of Motion for Summary Judgment filed on November 21, 2012 regarding the takings and substantive due process counts." Pl.'s Resistance Br. at 27.

The Court's Local Rules provide that a "party resisting a motion for summary judgment must ... file ... a brief ... in which the resisting party responds to *each of the grounds asserted* in the motion for summary judgment." LR 56(b)(1) (emphasis added). "If no timely resistance to a motion for summary judgment is filed, the motion may be granted without prior notice form the court." LR 56(c). In the present case, neither C. Line's Motion for Summary Judgment nor its brief in support thereof even mentions the takings and substantive due process claims, let alone resists Defendants' request for summary judgment on those claims with argument and appropriate citations to authority. *See generally* Clerk's Nos. 34, 34.1; *see also* Defs.' Reply Br. at 4. (correctly noting that "there is nothing in [C. Line's brief in support of its motion

for summary judgment] which mentions either Count."). Accordingly, summary judgment in favor of Defendants is warranted based solely on C. Line's failure to resist Defendants' Motion for Summary Judgment on the takings and substantive due process claims.

### C. *Cross Motions for Summary Judgment: Count Three*

In Count III of the Complaint, C. Line asserts that Defendants "acted arbitrarily, capriciously and maliciously when they violated C. Line's right to procedural due process of law before, during and after Malin's denial of C. Line's appeal of Guards' denial of its application [for] a new adult entertainment business (cabaret) license." Compl. ¶ 78. More specifically, C. Line contends Defendants violated its procedural due process rights in two separate ways: 1) by revoking the existing cabaret license granted to C. Line by virtue of the Consent Decree without notice or a fair hearing; and 2) by forcing C. Line to apply for a new adult business license and then illegally denying C. Line's application for such license without a fair hearing. Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 5 (Clerk's No. 34.1). Both C. Line and Defendants claim an entitlement to Summary Judgment on C. Line's procedural due process claim.

 "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy

that right they must first be noticed.'" *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233, 17 L.Ed. 531 (1863)). Thus, it is well-settled that "some form of hearing is required before an individual is finally deprived of a property interest." *Mathews*, 424 U.S. at 333, 96 S.Ct. 893 ("The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." (quotation and citation omitted)).

 Ultimately, to demonstrate that its procedural due process rights have been violated, C. Line must prove: 1) it had a protected liberty or property interest at stake; and 2) Defendants deprived Plaintiff of this interest without due process of law. *Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir.1999). In determining whether Plaintiff has either raised a genuine issue of material fact as to these elements or satisfied them, the Court must keep in mind that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* (citing *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). Nonetheless, "'Due process is flexible and calls for such procedural protections as the particular situation demands.'" *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

#### 1. *Defendants' Motion: Did C. Line adequately exhaust available state remedies?*

 The United States Supreme Court has held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." [29] *Patsy v. Bd. of Regents*

---

**29.** Defendants concede that "generally a

plaintiff is not required to exhaust state ad-

*of the State of Fla.,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In *Wax 'n Works v. City of St. Paul,* the Eighth Circuit found an exception to *Patsy's* general rule, holding that "[u]nder federal law, a litigant asserting a deprivation of *procedural due process* must exhaust state remedies before such an allegation states a claim under § 1983." 213 F.3d 1016, 1019 (8th Cir.2000) (emphasis added); *see also Crooks v. Lynch,* 557 F.3d 846, 848 (8th Cir.2009) (finding the *Wax 'n Works* requirement "is necessary for a procedural due process claim to be ripe for adjudication," relying in part on the premise that "a procedural due process violation 'is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process'" (quoting *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990))). In *Keating v. Neb. Public Power District,* the Circuit refined the *Wax 'n Works* exception, noting that "it is not necessary for a litigant to have exhausted available *postdeprivation* remedies when the litigant contends that he was entitled to *predeprivation* process." 562 F.3d 923, 929 (8th Cir.2009) (citing *Zinermon,* 494 U.S. at 132, 110 S.Ct. 975 ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking.") and *Westborough Mall, Inc. v. City of Cape Girardeau,* 794 F.2d 330, 337 (8th Cir.1986) ("The availability of post-deprivation remedies is not a defense to the denial of procedural due process where predeprivation process is practicable[.]")). Accordingly, "the effect of [a litigant's] failure to pursue available post-[deprivation] remedies depends on whether the [litigant] alleges the deprivation of pre-[deprivation] process or post-[deprivation] process." *Christiansen v. W. Branch Cmty. Sch. Dist.,* 674 F.3d 927, 936 (8th Cir.2012).

Relying on *Wax 'n Works,* Defendants first claim that, "[t]o proceed in this court on its 42 U.S.C. § 1983 *post-deprivation* procedural due process claim, C. Line must first exhaust available state remedies." Defs.' Br. at 14 (emphasis added). According to Defendants, C. Line "proceeded appropriately when it filed its action in the state court against the City and Malin and when it filed its Petition for a Writ of Certiorari against the [ZBA]." *Id.* "The Iowa Court of Appeals agreed with the trial court that C. Line's motion for summary judgment on its due process claim could not be granted on the record before it." *Id.* at 13. Thus, Defendants contend that C. Line "should have either appealed the Iowa Court of Appeals decision on its due process rights claim in *C. Line, Inc. v. Malin,* to the Iowa Supreme Court, or pursued a trial on remand of its due process claim for damages." *Id.* at 14–15. Since C. Line instead dismissed the state court action, Defendants argue it "can no longer sustain its 42 U.S.C. § 1983 claim because it is not ripe for adjudication and this court lacks subject matter jurisdiction." *Id.* at 15.

 The Court finds Defendants' argument unconvincing because it would essentially bar C. Line from pursuing a § 1983 action in federal court for a procedural due process violation without first pursuing and completing an identical § 1983 action in state court. Indeed, other than claiming that C. Line should have litigated its § 1983 procedural due process claim fully in the state courts—a course which would obviate the need for any federal § 1983

---

ministrative remedies before bringing a 42 U.S.C. § 1983 claim in federal court." *See*

Defs.' Br. at 14.

action—Defendants do not identify any available state remedy that C. Line has failed to exhaust. As C. Line points out, it undertook extensive efforts to exhaust available remedies in state courts. *See* Pl.'s Resistance Br. at 15–18. It administratively appealed Guard's September 24, 2009 denial letter, attempted to appeal Malin's October 26, 2009 appeals ruling to the ZBA, actually appealed Malin's October 26, 2009 appeals ruling to an Iowa district court, and obtained a writ of certiorari, declaratory judgment, and a writ of mandamus, the latter two of which were affirmed by the Iowa Court of Appeals.[30] C. Line also correctly points out that it "was not compelled to pursue its claim for damages to its conclusion in state court because its damage claim was not a mandatory appeal from an administrative action." Pl.'s Resistance Br. at 19 (citation omitted).

Further, despite some seemingly contradictory language in C. Line's own motion for summary judgment, it appears that C. Line premises its procedural due process claim on Defendants' alleged failure to provide it with *pre-deprivation* process, which is not subject to the exhaustion requirement of *Wax 'n Works. See Keating,* 562 F.3d at 929. Indeed, in resistance to Defendants' Motion for Summary Judgment, Plaintiff expressly states that "exhaustion of state remedies is not a prerequisite to a § 1983 due process claim" because Defendants' "refusal to honor the 2004 Federal Consent Decree constituted a pre-deprivation of C. Line's rights." Pl.'s Resistance

Br. at 18; *see id.* at 20 ("Guard's September 24, 2009 license denial letter was issued without a prior hearing and without notifying C. Line of any right to a hearing."). Pointing to section III.B. of Plaintiff's Brief in Support of its own motion for summary judgment, Defendants urge in their Reply brief that C. Line's resistance to Defendants' Motion for Summary Judgment:

> now claims—for the first time—that it was not necessary for Plaintiff to fully pursue post-deprivation remedies because the City's "refusal to honor the 2004 Federal Consent Decree constituted a pre-deprivation of C. Line's rights." (Brief, p. 18)[.] This assertion contradicts Plaintiff's Brief and Argument in Support of Motion for Summary Judgment in which it asserted: **"B. The Defendants filed to provide a fair *post-deprivation* hearing on the *revocation* of C. Line's *existing cabaret license under* Davenport city code section 16.16.160."** (Brief, pp. 8–9)[.] Plaintiff should not be allowed to completely change its theory of recovery in this fashion.

Defs.' Reply at 4.

The Court is unaware of any authority—and Defendants cite none—that would support a conclusion that Plaintiff's procedural due process claim must be limited by the arguments Plaintiff makes in support of its own motion for summary judgment.[31] Indeed, the contours of a party's claims are ordinarily determined by the allegations of

---

**30.** C. Line also correctly points out that, to the extent Defendants claim it should have exhausted additional remedies with the ZBA, the state court found such exhaustion unnecessary. *See* Pl.'s Resistance Br. at 17 (citing the December 7, 2010 state court decision wherein Judge Greve determined that the "doctrine of administrative remedies is inapplicable to the facts of this case").

**31.** To the extent that C. Line has failed to argue a postdeprivation claim *in resistance* to Defendants' Motion for Summary Judgment, however, the Court presumes C. Line has abandoned such claim. *See* LR 56(b)(1) (providing that a "party resisting a motion for summary judgment must ... file ... a brief ... in which the resisting party responds to *each of the grounds asserted* in the motion for summary judgment." (emphasis added)).

the Complaint, which in this case alleges that Defendants "violated C. Line's right to procedural due process of law *before, during and after Malin's denial of C. Line's appeal.*" Compl. ¶ 78 (emphasis added). Moreover, though it does not expressly use the phrase "pre-deprivation," section III of Plaintiff's Brief in Support of its own motion for summary judgment clearly articulates Plaintiff's pre-deprivation procedural due process claim, stating that Defendants "denied C. Line procedural due process of the law and violated C. Line's *protected real property right* to operate its cabaret business ... by revoking C. Line's *existing cabaret license without notice and without a fair hearing* and forcing C. Line to apply for a *new cabaret license* and then illegally denying C. Line's application for a *new cabaret license without a fair hearing.*" Pl.'s Br. at 5 (underlined emphasis added, italics emphasis in original).

2. *Defendants' Motion and Plaintiff's Motion: Did C. Line receive or not receive due process as a matter of law?*

Defendants next contend that C. Line received due process as a matter of law because: 1) after C. Line received Guard's September 24, 2009 denial letter, it appealed and was afforded a hearing on October 22–23, 2009, wherein Malin permitted C. Line's attorneys "to present whatever case they wanted," overruled every objection made by the City Attorney, and permitted C. Line to present seven witnesses and sixteen exhibits; and 2) after Malin's October 26, 2009 decision, C. Line filed two lawsuits against the City and was ultimately permitted to open after prevailing in obtaining a writ of certiorari and a declaratory judgment. Defs.' Br. at 15–17; *see id.* at 18 ("Throughout the license hearing and the state court proceedings, C. Line was afforded notice and an opportunity to be heard, which resulted in the relief C.

Line sought. This is the essence of due process of the law."). Both in resistance to Defendants' Motion for Summary Judgment and in support of its own Motion for Summary Judgment, C. Line argues, "[i]t is fundamental that when Defendants sought to terminate C. Line's nonconforming use at 4128 Brady Street, Defendants had to afford C. Line an opportunity for a hearing *before* the termination becomes effective." Pl.'s Resistance Br. at 20 (citing *Brown v. Bathke,* 566 F.2d 588, 592 (1977)); *see also* Pl.'s Br. at 5 ("Defendants denied C. Line procedural due process of the law and violated C. Line's *protected real property right* to operate its cabaret business ... by revoking C. Line's *existing cabaret license[.]*"). As well, Plaintiffs contend that Defendants also violated their procedural due process rights by "forcing C. Line to apply for a *new cabaret license* and then illegally denying C. Line's application for a *new cabaret license* without a fair hearing." Pl.'s Br. at 5.

a. *Did C. Line have a protected property interest?*

In determining whether C. Line received adequate due process, the Court must first evaluate whether C. Line had a sufficient property interest to warrant due process protection in the first instance. *See Roth,* 408 U.S. at 570–71, 92 S.Ct. 2701 ("[T]o determine whether due process requirements apply in the first place, we must look ... to see if the interest is within the Fourteenth Amendment's protection of liberty and property."); *Bowers v. Polk Cnty. Bd. of Supervisors,* 638 N.W.2d 682, 690 (Iowa 2002) ("A person is entitled to procedural due process when state action threatens to deprive the person of a protected liberty or property interest.").

**1036**

i. *Is C. Line's license/nonconforming use under the Consent Decree a property right?*

Defendants correctly point out that "the Constitution does not establish a property right, rather property rights must come from another source, such as state law." Defs.' Br. at 18 (citing *Snaza v. City of St. Paul, Mn.,* 548 F.3d 1178, 1182 (8th Cir. 2008)); *see also Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."). Defendants cite a single case, *Hawkeye Commodity Promotions, Inc. v. Vilsack,* in support of the proposition that "C. Line's adult cabaret business license was[, like the interest at issue in *Hawkeye,*] not a protected property right." Defs.' Br. at 18 (citing 486 F.3d 430 (8th Cir.2007)).

In *Hawkeye,* a retailer of TouchPlay lottery machines attempted to enjoin Iowa legislation ending the TouchPlay lottery game, claiming that the legislation violated the contracts, takings, equal protection, and substantive due process[32] clauses of the Constitution. 486 F.3d at 435. In regard to its takings claim, the retailer argued that it had a property interest in the continued operation of its business. *Id.* at 439–40. The appellate court rejected the retailers assertion, concluding that the retailers monitor vending machines ("MVM") license did not give rise to property right protected by the takings clause for at least three reasons: 1) the Iowa Administrative Code explicitly stated that "[t]he possession of an MVM license ... is a privilege personal to that person or entity and not a legal right"; 2) the Iowa Administrative Code additionally provided that MVM licenses could not be "sold, assigned, or transferred," such that the MVM license " 'lacks indicia of a property interest' "; and 3) Iowa law has long held that " 'when a business is inherently illegal [e.g., liquor, tobacco] a permit to operate may be granted or refused at the will of the licensing body [and] is a privilege rather than a property right' " *Id.* (citing district court decision and *Cent. States Theatre Corp. v. Sar,* 245 Iowa 1254, 66 N.W.2d 450, 455 (1954)).

*Hawkeye* is easily distinguishable from the present case. Here, the August 20, 2004 Consent Decree between C. Line and the City explicitly provided, among other things, that the City "will issue an adult cabaret license to C. Line, Inc., d/b/a/ Chorus Line; § 5.16.120 notwithstanding," that the "Chorus Line is a pre-existing nonconforming use," and that "C. Line, Inc. shall be allowed to amend its corporate structure, if necessary, such that the majority interest in C. Line, Inc., the owner of the adult cabaret license, may be sold or transferred to any otherwise qualified person or entity pursuant to Chapter 5.16 of the Davenport Municipal Code." Pl.'s Facts ¶¶ 14–17. Unlike in *Hawkeye,* Defendants have not identified any provision of state or municipal law explicitly identifying an adult entertainment business license as not constituting a "legal right." Neither have Defendants argued that such a license is inherently illegal such that it should be deemed merely a privilege rather than a right. As well, the plain language of the Consent Decree permits the adult business entertainment license/non-

**32.** Unlike the present case, there was no procedural due process claim raised in *Hawkeye.*

*See* 486 F.3d at 430.

conforming use to remain with C. Line despite changes in corporate structure and ownership. *See United States v. Craft,* 535 U.S. 274, 284, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (stating that the "right to alienate (or otherwise encumber)" property is one indicator of a property right).

■ The Eighth Circuit has recognized that property interests under state law may be created in a variety of ways. *See Movers Warehouse, Inc. v. City of Little Canada,* 71 F.3d 716, 718–19 (8th Cir. 1995). Of particular relevance to this case, "a state may create a protected property interest by 'understandings between the state and the other party.'" *Id.* at 719 (quoting *Craft v. Wipf,* 836 F.2d 412, 417 (8th Cir.1987)). Here, the Court agrees with Plaintiff that at all times relevant to this action, C. Line had a license to operate Chorus Line as a prior nonconforming use by virtue of an understanding between the parties, i.e., the August 20, 2004 Consent Decree. Because the Consent Decree gave C. Line's a "legitimate claim of entitlement" to its license/nonconforming use, rather than "a mere abstract desire or unilateral expectation" of a license/nonconforming use, its interest is a "property interest" for purposes of procedural due process. *Greenwood Manor v. Iowa Dep't of Pub. Health, State Health Facilities Council,* 641 N.W.2d 823, 837 (Iowa 2002) (citing *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); *see also Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ("Once licenses are issued ... their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that proce-dural due process required by the Fourteenth Amendment.").

ii. *Did C. Line have a protected property interest in receiving a new cabaret license independent of the license/nonconforming use granted by the Consent Decree?*

In its own Motion for Summary Judgment, C. Line appears to assert that Defendants' denial of its request for a *new* cabaret license without notice and without a fair hearing was a procedural due process violation, independent of the license/nonconforming use C. Line had by virtue of the Consent Decree. *See* Pl.'s Br. at 5. In resistance to Defendants' Motion for Summary Judgment, however, C. Line *only* argues that it had a right to procedural due process before Defendants revoked the license/nonconforming use granted it by the Consent Decree. *See* Pl.'s Resistance Br. at 20–22. Likewise, in resisting C. Line's Motion for Summary Judgment, Defendants do not specifically address C. Line's claim that its procedural due process rights were violated with respect to its application for a *new* cabaret license. *See* Defs.' Br. in Resistance to Pl.'s Mot. for Summ. J. ("Defs.' Resistance Br.") at 8–12 (Clerk's No. 46.1).

■ Given C. Line's different approaches in supporting its own motion and resisting Defendants' motion, the Court is uncertain if C. Line's intent is to proceed on a single theory of procedural due process violation or two separate theories. Assuming the latter, the Court finds that the parties have not sufficiently developed the issue (i.e., whether C. Line had a cognizable protected property interest in a *new* license) to permit the Court to grant summary judgment in favor of either party.[33] Accordingly, both parties' motions for summary judgment are denied as to C.

---

**33.** Even when it attempts to surmise C. Line's arguments based on the record as a whole, there appear to be genuine issues of material fact that preclude summary judgment in favor of either C. Line or Defendants on the question of whether C. Line had a "property right" in its new license application. As not-

Line's claim for denial of due process based exclusively on a *new* license.

### 3. *What process was due?*

■ Having determined that C. Line had a protected property interest in its license/nonconforming use pursuant to the Consent Decree, the Court next turns to an analysis of what process was constitutionally due. In *Mathews*, the Supreme Court identified three distinct factors to consider in determining the mandates of due process in a particular situation: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 334–35, 96 S.Ct. 893.

■ The Court agrees with C. Line that it was entitled to notice and a hearing *before* Defendants revoked its license/nonconforming use pursuant to the Consent Decree. Indeed, Defendants' own Municipal Code provides that only certain bases support revocation or suspension of an existing license, and that an aggrieved license-holder must be provided with notice and an opportunity to contest the revocation or suspension.[34] Without commenting

---

ed previously, to have a constitutionally cognizable property interest, a person must have a "legitimate claim of entitlement" to it, not just "a mere abstract desire or unilateral expectation." *Greenwood Manor*, 641 N.W.2d at 837. "A property interest arises when state law creates 'expectations that are justifiable.'" *Austell v. Sprenger*, 690 F.3d 929, 935 (8th Cir.2012) (quoting *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 796, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980)). "No property interest arises where the statutory claim to a benefit is 'too ephemeral and insubstantial.'" *Id.* (quoting *O'Bannon*, 447 U.S. at 796, 100 S.Ct. 2467).

As to the question of whether C. Line's had a justifiable expectation that it would receive a *new* cabaret license, the Court has several concerns. First, given that C. Line already possessed a license/nonconforming use at the time of its application, the Court must question whether it reasonably can assert a "legitimate claim of entitlement" to a new license issued independent of its preexisting license/nonconforming use (i.e., why would C. Line be entitled to a new license when it already possessed a license/nonconforming use pursuant to the Consent Decree?). Second, in support of its Petition for a Writ of Certiorari, C. Line argued that the City's Finance Department only had discretion to "deny the issuance of an adult entertainment business license 'based upon the recommendation of the reviewing departments,'" which all recommended approval of C. Line's new

license application. Pl.'s App. at 18 (Pet. for Writ of Certiorari ¶ 9); Pl.'s Facts ¶ 31 (stating that all reviewing departments approved C. Line's application). While § 5.16.050(E) does provide that the "finance department *shall*, within thirty days after the submission of a properly completed application *either issue an adult entertainment business license pursuant to Section 5.16.060 of this chapter or shall deny the issuance of a license based upon the recommendation of the reviewing departments*," this language arguably conflicts with the language of § 5.16.060(A), which provides that "Finance department shall issue *or deny* an adult entertainment business license to an applicant based on the upon the reports, investigations and inspections and recommendations of the reviewing departments *and on any other credible information on which it is reasonable for the city to rely*." Pl.'s App. at 42–43 (emphasis added).

**34.** Davenport's Municipal Code § 5.16.160 provides in relevant part:

License revocation or suspension.
A. Grounds. Pursuant to the procedures set forth hereinafter, the finance department may suspend, for not more than one year, or revoke, any adult entertainment business license if the finance department determines, based upon credible and reasonably reliable information and evidence, that one or more of the following have occurred:

on the preexisting license/nonconforming use issue, Guard denied C. Line's license application on September 24, 2009 on the basis that Dr. John's was an adult establishment within 500 feet of Chorus Line's intended location. *Id.* at 58. By so doing, he effectively revoked or suspended[35] C. Line's preexisting license/nonconforming use without any prior notice or hearing, in violation of Defendants' own procedures.[36]

1. The licensee has violated any of the provisions or requirements of this chapter or the zoning provisions of the city code applicable to adult establishments;

2. The licensee (1) knowingly or negligently furnished false or misleading information or withheld information on any application or other document submitted to the city for the issuance or renewal of any adult entertainment business license; or (2) knowingly or negligently caused or suffered any other person to furnish false or misleading information or to withhold any information on the licensee's behalf;

3. The licensee committed a felony or specified criminal act;

4. The licensee authorizes, approves, or as a result of the licensee's negligent failure to supervise the licensed premises or the adult entertainment establishment, allows, suffers or permits an adult establishment employee, an adult establishment patron or any other person to (a) violate any of the provisions or requirements of this chapter or the license issued pursuant hereto; or (b) commit any felony or specified criminal act on the licensed premises; or

5. The licensee or any person identified pursuant to Section 5.16.040D becomes disqualified for the issuance of an adult entertainment business license at any time during the term of the license at issue.

B. An adult entertainment business license may be suspended for up to one year or revoked pursuant to the terms and conditions set forth herein.

1. Notice. Upon determining that one or more of the grounds for suspension or revocation exist, the finance department shall serve a written notice on the licensee in person or by certified mail, return receipt requested, addressed to the licensee's address as set forth in the application. The notice shall (a) state that the city has determined that the licensee's adult entertainment business license is suspended for a specified number of days or revoked, (b) state the specific basis for the city's determination; (c) state the date by which the licensee must file an appeal of the suspension or revocation by given written notice of the appeal to the city clerk.

2. Hearing. The appeal hearing shall be conducted by the city administrator or the city administrator's designee. The hearing shall be no less than fourteen days after service of the licensee's written notice to appeal is received by the city clerk unless otherwise agreed to by the parties. No transcription of the record will be made though either party may have a transcriber present at their own expense. At the hearing, the city shall present evidence to support the suspension or revocation of the license, followed by the licensee's presentation of evidence to refute the grounds cited by the city for suspending or revoking the license. Within three days after the close of the hearing, the city administrator or the city administrator's designee shall render a decision in writing setting forth the reasons in support of the decision rendered. The written decision shall be served on the licensee in person or by certified mail, return receipt requested, addressed to the licensee's address as set forth in the application. The decision of the city administrator or the city administrator's designee shall be final.

3. Upon the suspension or revocation of an adult entertainment business license, the city shall take custody of the suspended or revoked license. . . .

Pl.'s App. at 42–43.

35. Although Defendants do not directly address the revocation issue, the Court can think of no meritorious argument that would support a conclusion that denying C. Line's *new* license application did not also effectively *revoke* C. Line's existing license/nonconforming use. Indeed, after being notified that its "application for an adult cabaret license to open 'The Chorus Line' at 4128 (Suite A) Brady Street is denied," one could not reasonably expect C. Line to believe that it still could operate the Chorus Line pursuant to its preexisting license/nonconforming use.

36. Guard's knowledge of the Consent Decree for purposes of procedural due process need not be actual, as was the case with C. Line's contempt claim. Guard, in his position as

Although Defendants do not directly address C. Line's argument about revocation of its existing license, they do assert that "C. Line's license was not denied until Malin's decision." Even assuming that C. Line's preexisting license/nonconforming use was not "finally" extinguished until Malin's October 26, 2009 decision, however, it is still apparent that C. Line was not afforded a *meaningful predeprivation* notice and opportunity to be heard.

 Defendants argue that C. Line received adequate due process because it was provided with notice of the denial of its license application, appealed the denial, and was "provided a hearing in which it presented considerable evidence." Defs.' Reply at 4–5. There is no dispute that a hearing was, in fact, held, on October 22–23, 2009, with Malin as the presiding official. Pl.'s Facts ¶ 49. The mere fact that a hearing was held, however, does not mean that C. Line was provided with the opportunity to be heard "at a meaningful time and in a meaningful manner" as required to satisfy due process. *Hopkins,* 199 F.3d at 975. It is fundamental that due process requires a fair and unbiased tribunal, regardless of whether that tribunal is in the context of a court hearing or some other administrative hearing. *See, e.g., Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, 876, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009) ("It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955))); *Marshall v.*

*Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."); *Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) (finding that the fair tribunal requirement "applies to administrative agencies which adjudicate as well as to courts"); *Deretich v. Office of Admin. Hrg's, State of Minn.,* 798 F.2d 1147, 1152 (8th Cir.1986) ("[A] hearing officer must be impartial for an administrative agency to meet the requirements of due process."). Although administrative adjudicators are clothed with a "presumption of honesty and integrity," *In re Morgan,* 573 F.3d 615, 624 (8th Cir.2009) (quoting *Withrow,* 421 U.S. at 47, 95 S.Ct. 1456), a plaintiff may overcome this presumption by making a "substantial showing" that the adjudicator was biased or the hearing was otherwise unfair. *United States ex rel. De Luca v. O'Rourke,* 213 F.2d 759, 765 (8th Cir.1954).

In this case, C. Line has made a substantial showing that the October 22–23, 2009 hearing was fundamentally unfair, both because of Malin's involvement and because of the procedures employed. The evidence demonstrates that Malin was involved in the initial decision to deny C. Line's request for an adult entertainment license, whether as a new license or a preexisting license/nonconforming use at the Brady Street location. *See* Pl.'s App. at 169 (Oct. 22, 2009 Hr'g Tr. wherein

---

Finance Director, was tasked by Davenport's own Code with primary authority to issue, deny, suspend, or revoke adult entertainment business licenses. *See* Pl.'s App. at 37–42 (Davenport Municipal Code §§ 5.16.060(A)-(B), 5.16.160(A)). By having such authority, Guard knew or reasonably should have known of the Consent Decree before issuing his September 24, 2009 denial letter. Moreover, Davenport's attorneys drafted and con-

sented to the Consent Decree in the first instance, and also acknowledged its existence prior to Guard issuing the denial letter. *See* Pl.'s App. at 145 (September 3, 2009 email from Heyer to C. Line's counsel stating that the "Legal Department was provided with proof that the Chorus Line was in business within the last year so they may continue to operate as a nonconforming use at that location.").

Malin admits he performed a site inspection of Dr. John's on September 21, 2009, and admits that he had conversations with various city employees and officials about C. Line's license prior to the time C. Line filed its appeal of Guard's letter); *id.* at 175–78 (Guard testifying on October 23, 2009 that: 1) after all relevant city departments signed off on C. Line's application, Malin "offered [him] information which [was] pertinent to the issuance or denial of [C. Line's] license,"; 2) he made his decision based on "[i]nformation received from Mr. Malin's observations" at Dr. John's; and 3) Warner wrote the actual September 24, 2009 denial letter); *id.* at 181–82 (Hameed testifying on October 23, 2009 that Malin announced at a public meeting the day before Guard's letter that "*he* denied the license" to C. Line (emphasis added)). While acting as an investigator and an adjudicator in regard to the same proceeding does not inherently give rise to a conclusion that the process is biased, *see Withrow*, 421 U.S. at 52, 95 S.Ct. 1456 (noting that case law "generally rejects the idea that the combination of judging and investigating functions is a denial of due process" (citations omitted)), this was not Malin's only conflict.[37]

**37.** In *Caperton*, the Supreme Court noted that in *Tumey v. Ohio*, it held that "matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion," 556 U.S. 868, 129 S.Ct. 2252 (quoting 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927), such that "[p]ersonal bias or prejudice 'alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause.'" *Id.* (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)). Writing for the majority, however, Justice Kennedy made clear that "[a]s new problems have emerged ... the Court has identified additional instances which, as an objective matter, require recusal. These are circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable.'" *Id.* at 877, 129 S.Ct. 2252 (quoting *Withrow*, 421 U.S. at 47, 95 S.Ct. 1456). One such circumstance is where the "judge ha[s] a conflict of interest ... because of his earlier participation" in a proceeding. *Id.* at 880, 129 S.Ct. 2252. The inquiry into whether such a conflict is of constitutional magnitude is "an objective one. The Court asks not whether the judge is actually subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Id.* at 881, 129 S.Ct. 2252.

In this case, Malin's participation in the initial denial decision makes him constitutionally ill-suited to preside over the appeal of that decision. Malin claims in his affidavit that he overruled C. Line's motions to disqualify him on the basis that he "strongly believed that I would be fair, impartial and thorough. I strongly disagreed that I could not be a neutral decision-maker in the case. In fact, I considered that [C. Line] would receive the most impartial hearing if I served as the Hearing Officer, in that no subordinate staff member would be concerned whether they were overruling a decision of a department head or reaching a decision *contrary to my understanding of Dr. John's, from my prior, cursory visit.*" Defs.' App.· at 43 (emphasis added). While the Court does not doubt Malin's sincerity in this regard, the fact remains that Malin significantly participated in the initial decision to deny C. Line's adult business entertainment license, making it "difficult if not impossible for [Malin] to free himself from the influence of what took place in [relation to reaching the initial denial decision]." *Id.* at 880, 129 S.Ct. 2252 (citations omitted). Indeed, an average hearing officer in Malin's position could not reasonably be expected to be "neutral" when facing a challenge to a decision he helped to make. *See Caperton*, 556 U.S. at 888, 129 S.Ct. 2252 (recounting that almost every state has adopted judicial reforms providing that "A judge shall avoid impropriety and the appearance of impropriety" and providing that the test for the appearance of impropriety is "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired") (quoting ABA Annotated Model Code of Judicial Conduct, Canons 2 & 2A (2004)).

During the October 22–23 hearing, the only testimony the City offered supporting a conclusion that Dr. John's was an "adult establishment" was Warner's, who testified that he took photos and made observations during his own approximately ten minute visit to Dr. John's that convinced him that Dr. John's was an adult establishment. *See* Defs.' App. at 10–12. C. Line then put on several of its own witnesses, including Smith, the manager of Dr. John's. After C. Line questioned Smith and the City cross-examined her, Malin asked Smith additional questions that appear to have been designed to discount Smith's position that Dr. John's was not an adult establishment. *See* Pl.'s Supp.App. at 23 (Malin asking Smith, among other things, whether she was the manager of Dr. John's the entire time, whether she had an inventory count, and who designed the layout of Dr. John's).

At the conclusion of the October 22–23 hearing, the following record was made:

C. Line's Attorney: [T]he City has never established that Doctor John's is an adult business even today, although we have the testimony of Mr. Warner who says his opinion is that it's an adult entertainment business based upon an inspection two days ago, the City has never issued any letter or documents to Doctor John's classifying them as an adult entertainment business. As of the time that the license was denied by Mr. Alan Guard, Doctor John's was not classified as an adult entertainment business. Therefore, the City has not basis to deny this particular license because of Dr. John's. You've heard the testimony of the manager of Doctor John's establishing that they do not constitute an adult entertainment business. We have the pictures, showing the entire stock and trade of Doctor John's regarding this issue.

. . .

Malin: "[Y]our statement that the City has no basis to deny the C. Line adult cabaret license because Doctor John's is not an adult use and that you provided that entire stock and trade of their inventory, have either of you gentlemen ever been to Doctor John's? And do you know what their inventory includes, or am I just to base my testimony—or my findings on—

C. Line's Attorney: You're to base your findings, Mr. Hearing Officer, on the testimony. That's outside the record, and we're not going to enter any evidence on that.

Malin: Okay.

Pl.'s App. at 183. Despite the fact that the record in the administrative proceeding was closed, Malin proceeded to conduct his own ex parte post-hearing inspection of Dr. John's. *See* Pl.'s App. at 66 (Malin's October 26, 2009 decision: "After the hearing, a follow up site inspection of Dr. John's was conducted to ascertain the approximate percentage of adult material for sale at the store. In my capacity as Hearing Officer, I conducted this Inspection . . . ."). Malin then rendered a decision against C. Line based, not on the record and evidence presented at hearing, but on his own inspection of Dr. John's. *See id.* at 66–67 ("It is [my] opinion, confirmed by direct inspection and calculation at the post hearing site inspection, that Dr. John's is . . . an adult establishment. [C. Line, its attorneys, and Dr. John's] all contend that Dr. John's is not an adult establishment. These contentions are blatantly self-serving and are so utterly contrary to any honest assessment of the inventory clearly visible upon entry to [Dr. John's] that they call into question whether any statements made by these men may be believed.").

Perhaps the most troubling aspect of Defendants' actions is what Malin did *not* say in his October 26, 2009 decision. Although C. Line raised the issue of its Consent Decree license/nonconforming use at the October 22–23 hearing, Malin did not address it in his written October 26, 2009 decision. However, in his affidavit submitted in this action, Malin states:

> At the hearing, Plaintiff's counsel asserted that Plaintiff possessed a legal nonconforming use pursuant to the Federal Consent Decree. I sought advice from the City Attorney about whether C. Line continued to have a legal nonconforming use and I was advised by both City Attorney Warner and Assistant City Attorney Heyer that the nonconforming use 'ran with the land' and became Dr. John's when Plaintiff was evicted from the property.

Defs.' App. at 43. Malin's affidavit makes clear that in rejecting C. Line's preexisting license/nonconforming use, he relied on legal advice from the City's primary witness to make his decision in regard to C. Line's adult business entertainment license, given without the knowledge of C. Line, and without any opportunity for C. Line to cross-examine or provide contrary evidence. Under these circumstances, no reasonable person could find that the October 22–23 hearing was fair, impartial, or unbiased. Indeed, after conducting its own analysis, the Court agrees with Judge Kelley that the record supports only one conclusion:

> Defendant Craig Malin assumed a personal commitment to a particular result, that is, the denial of the license. The investigating done by Craig Malin both before the hearing and after the hearing, and the questioning of at least one witness after the Assistant City Attorney had concluded cross examination of that witness, indicate a personal bias toward an outcome desired by Defendant Malin. This combination of all

three functions of investigation, advocacy and adjudication, has the appearance of fundamental unfairness in this administrative hearing, thus vitiating its legal effect.

Pl.'s App. at 97–98; *see Botsko v. Davenport Civil Rights Comm'n,* 774 N.W.2d 841, 853 (Iowa 2009) (finding an "appearance of fundamental unfairness in the administrative process" where an adjudicator also engaged in prosecutorial functions and that these conflicting roles create a "risk of injecting bias in the adjudicatory process" that obviates any requirement need to show actual prejudice).

Based on this record, C. Line has unquestionably raised a genuine issue of material fact sufficient to defeat Defendants' request for summary judgment on its procedural due process claim. For purposes of C. Line's own request for summary judgment, the Court turns to an evaluation of the *Mathews* factors. First, there is no doubt that C. Line possessed an important private interest in its license/nonconforming use because, without it, C. Line could not operate its business. *See Bell,* 402 U.S. at 539, 91 S.Ct. 1586. Second, given the procedures employed by Defendants in this case, the risk of erroneous deprivation of C. Line's interest was high. Indeed, given the Court's findings *supra* about the fundamental unfairness of the only process employed by Defendants—the October 22–23, 2009 hearing—C. Line was actually provided the functional equivalent of no process at all. Finally, while Defendants certainly have an interest in appropriately regulating licenses, there is no indication whatsoever that providing C. Line with *fair* and *unbiased* predeprivation due process would have been overly burdensome. Accordingly, the Court concludes that Plaintiff has demonstrated an entitlement to summary judgment on its claim that: 1) it had a protected property interest at stake in the form of its license/noncon-

forming use pursuant to the Consent Decree; and 2) Defendants deprived Plaintiff of this interest without due process of law.[38] *Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir.1999).

### D. *Punitive Damages*

Defendants request summary judgment on C. Line's claim for punitive damages under Iowa law, asserting that the record is devoid of any evidence that Defendants' conduct constituted a willful and wanton disregard for the rights or safety of another. Defs.' Br. at 22 (citing Iowa Code § 668A.1. Plaintiff has not offered any resistance to Defendants' arguments in this regard.[39] *See generally* Pl.'s Resistance

Br. (failing to provide any facts or argument in support of a claim for punitive damages). Accordingly, summary judgment is granted in favor of Defendants on punitive damages. *See* LR 56(b)(1) (providing that a "party resisting a motion for summary judgment must … file … a brief … in which the resisting party responds to each of the grounds asserted in the motion for summary judgment." (emphasis added)).

### E. *Vicarious Liability*

 Defendants finally request summary judgment on C. Line's claim that the City is vicariously liable for the conduct of Malin and Guard. Defs.' Br. at 23.

---

**38.** To the extent Defendants contend that C. Line ultimately received due process by bringing an action in Iowa state court and obtaining a Writ of Certiorari and Declaratory Judgment, Defendants claim is without merit. As Defendants concede, C. Line's new license was denied and its preexisting license/nonconforming use was effectively revoked, at the latest, when Malin issued his October 26, 2009 decision. Any "process" afforded C. Line after this date cannot excuse Defendants' failure to provide C. Line with appropriate procedural due process *prior* to the revocation of C. Line's existing property right. *See Fuentes*, 407 U.S. at 81–82, 92 S.Ct. 1983 ("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred."); *Zinermon*, 494 U.S. at 133, 110 S.Ct. 975 ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking.").

**39.** Though Plaintiff does not resist Defendants' argument regarding punitive damages in its resistance to Defendants' Motion, the

Court does note that Plaintiff's brief in support of its own motion for summary judgment contends that Defendants are liable for punitive damages. *See* Pl.'s Resistance Br. at 24–26. In particular, Plaintiff argues: Defendant Malin's and Guard's conduct was *malicious* because it was accompanied by ill will, or spite, and was for the purpose of economically injuring C. Line by closing the Chorus Line cabaret. Defendants' conduct was in *reckless disregard* of C. Line's rights because it reflected complete indifference to C. Line's constitutional right to due process of the law. Defendant Malin's and Guard's conduct was *oppressive* because the Defendants injured or damaged or otherwise violated the rights of C. Line with unnecessary harshness or severity, such as by the use or abuse of authority or power or by taking advantage of some misfortune of C. Line. This Court should find that Defendants Malin's and Guard's actions were malicious, wanton, reckless, callous or oppressive and were taken with the intention to cause serious injury to C. Line's protected property rights by summarily closing the Chorus Line cabaret. Defendants deprived C. Line of its constitutional right to due process of the law and they are liable to C. Line for punitive damages.

*Id.* at 25–26 (citations omitted). Although Plaintiff has parroted language from case law regarding the type of conduct that would support an award of punitive damages, its brief is notably devoid of any *facts*, or even argument, that would support a finding of willfulness or wantonness on this record.

To prove a constitutionally based § 1983 claim against a municipality, C. Line must demonstrate that the constitutional violation resulted from an action taken pursuant to "official municipal policy."[40] *Monell v. Dept. of Social Serv. of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered."). The Eighth Circuit has interpreted "official municipal policy" as necessarily involving " 'a deliberate choice to follow a course of action ... made from among various alternatives' by an official who has the final authority to establish governmental policy." *Jane Doe "A" by and through Jane Doe "B" v. Special Sch. Dist. of St. Louis,* 901 F.2d 642, 645 (8th Cir.1990) (quoting *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292).

In the present case, C. Line avers that the *"official policy* of the City of Davenport was to prevent Mr. Nadeem Mazhar from reopening the Chorus Line cabaret," Pl.'s Br. at 14–15, and that Defendants Guard and Malin had "final decision making and policy making authority to deny C. Line its license and administratively uphold that denial." Pl.'s Resistance Br. at 25. Defendants argue that, while Malin or

Guard may have had final *decision-making* authority, final *policy-making* authority at all times remained in the hands of the Davenport City Council. Defs.' Br. at 24–25 ("Neither [Malin nor Guard] had final policy making authority regarding business licenses."). In support of this assertion, Defendants proffer eight identical affidavits from current or former members of the City Council, each attesting that "The City Council is the policy-making body for the City of Davenport," "[t]he City of Davenport had no policy to prevent The Chorus Line cabaret from reopening in 2009," and that the "only policy the City of Davenport had in 2009 was to require that The Chorus Line comply with ordinances of the City." Defs.' App. at 45–52. As well, Defendants point to Iowa Code § 364.2(1) (2009), which provides that "[a] power of a city is vested in the city council except as otherwise provided by a state law," and Iowa Code § 372.13(4), which provides: "Except as otherwise provided by state or city law, the council may appoint city officers and employees, and prescribe the powers, duties, compensation, and terms." Defendants also recount that Malin, as City Administrator, is in charge of the "department of city administration and responsible and accountable to the mayor and city council for the performance of the fiscal, administrative and coordinative service functions of the city, including, but not limited to ... [i]mplementing all policy directives promulgated by the mayor ... and by the council...." Defs.' Br. at 24 (citing Davenport Municipal Code § 2.30.020(a)). Defendants further claim that Guard, as Finance Director, is respon-

---

**40.** Generally, a § 1983 claim can also be proven by demonstrating that the constitutional violation resulted from a "governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Monell,* 436 U.S. at 691, 98 S.Ct. 2018. The

Court sees no need to discuss "custom," however, since C. Line only claims that the City is liable on the basis of "official municipal policy." *See generally* Pl.'s Resistance Br. at 24–26 (arguing that Malin and Guard had final policy making authority, but providing no argument or reference to "custom").

sible for purchasing "equipment, materials, supplies and independent contractors' services for the City's use, and for the City's purchasing division." *Id.* at 25 (citing Davenport Municipal Code § 2.12.090).

 The determination of whether an official has final policymaking authority is one for the Court. *See Jett v. Dallas Ind. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) ("[T]he identification of those officials whose decision represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury."); *Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1215 (8th Cir.2013) ("It is the 'trial judge'—not the jury—who 'must identify those officials ... who speak with final policymaking authority for the local government.'" (citing *Jett,* 491 U.S. at 737, 109 S.Ct. 2702).) "The identification of policymaking officials is a question of state law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion). " 'Authority to make municipal policy may be granted directly by legislative enactment or may be delegated by an official who possesses such authority.'" *Id.* (quoting *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292). Although it may not "speak with perfect clarity," ordinarily "state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* at 124–26, 108 S.Ct. 915 ("In any event, however, a federal court would not be justified in assuming a municipal policymaking authority lies somewhere other than where the applicable law purports to put it."). Moreover, "when an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departure from

them, are the act of the municipality." *Id.* at 127, 108 S.Ct. 915.

 C. Line contends that both Guard and Malin were final policymakers because the City Council abdicated its policy making authority to them such that Guard and Malin possessed "final decision making and policy making authority to deny C. Line its license and administratively uphold that denial." Pl.'s Resistance Br. at 25. The Eighth Circuit has held that "a very fine line exists between delegating final policymaking authority to an official, for which a municipality may be held liable, and entrusting discretionary authority to that official, for which no liability attaches." *Williams v. Butler,* 863 F.2d 1398, 1402 (8th Cir.1988). "The distinction, we believe, lies in the amount of authority retained by the authorized policymakers. A clear message from *Praprotnik* is that an incomplete delegation of authority—i.e., the right of review is retained—will not result in municipal liability, whereas an absolute delegation of authority may result in liability on the part of the municipality." *Id.*

 Despite Defendants attempts to constrain the authority of Malin and Guard to the functional job descriptions provided in Davenport Municipal Code §§ 2.30.020(A) and 2.12.090, other City ordinances tasked Malin and Guard with seemingly exclusive responsibilities in relation to the issuance of, and appeals from denials and revocations of, adult business entertainment licenses. In regard to issuing or denying a new license, the City's ordinances delegated authority to the finance department to "issue or deny adult entertainment business license[s]." *See* Pl.'s App. at 37 (Davenport Municipal Code § 5.16.060(A); *id.* (Davenport Municipal Code § 5.16.060(B), providing that "[i]f the city determines that the applicant has not met one or more of the conditions

... then the finance department shall deny issuance of the adult entertainment business license"). Likewise, the City delegates authority to revoke or suspend issued adult business entertainment licenses to the "finance department." *Id.* at 42 (Davenport Municipal Code § 5.16.160(A), providing that "the finance department may suspend ... or revoke, any adult entertainment business license if the finance department determines, based upon credible and reasonably reliable information and evidence, that [certain violations] have occurred"). The City's ordinances further delegate authority to hear appeals of license denials, revocations or suspensions, to "the city administrator or the city administrator's designee." *Id.* at 37 (Davenport Municipal Code § 5.16.050(F); *id.* at 43 (Davenport Municipal Code § 5.16.160(B)(2). None of these sections contains a reservation of rights by any other City official to review or reconsider the decisions reached by Guard and Malin. Accordingly, the Court finds that C. Lines has, at a minimum, demonstrated the existence of sufficient factual disputes regarding Guard's and Malin's authority to defeat Defendants' Motion for Summary Judgment on vicarious liability.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Clerk's No. 47) is GRANTED IN PART and DENIED IN PART. In particular, Defendants' Motion is granted as to: 1) C. Line's claim for further enforcement in Count I; 2) C. Line's request for a contempt finding against Guard; 3) C. Line's takings and substantive due process claims in Counts II and IV; and 4) C. Line's request for punitive damages. Defendants' Motion is denied as to: 1) C. Line's request for contempt findings against Malin and Davenport; 2) C. Line's procedural due process claims; and 3) vicarious liability. C. Line's Motion for Summary Judg-

ment (Clerk's No. 35) is also GRANTED IN PART and DENIED IN PART. Specifically, C. Line's request for summary judgment on its procedural due process claim in relation to its existing license/nonconforming use pursuant to the Consent Decree is granted as to liability; the motion is denied in all other respects.

Given the Court's ruling, it appears that several issues remain for either trial or further disposition, including damages for the procedural due process violation, disposition of the contempt claim against Malin and Davenport, and matters relating to attorneys' fees and costs. The parties shall be fully prepared to discuss with Magistrate Judge Walters at the final pretrial conference the continued need for bench or jury trials in this case, and the scope thereof.

IT IS SO ORDERED.